UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL A. MURRAY,

                              Plaintiff

-vs-

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

DECISION AND ORDER

17-CV-6750 CJS

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application of Michael A. Murray ("Plaintiff") for Supplemental Security

Income Benefits ("SSI").   Plaintiff claims to be completely disabled, primarily due to

psoriasis and an affective disorder, but the Commissioner found otherwise.   Now

before the Court is Plaintiff's motion for judgment on the pleadings (Docket No. [#10])

and Defendant's cross-motion [#14] for the same relief.   Plaintiff's application is denied,

Defendant's application is granted, and this action is dismissed.

## FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this

action.   The Court will briefly summarize the record as necessary for purposes of this

Decision and Order.

On September 18, 2014, Plaintiff filed an application for SSI benefits, claiming that he became totally disabled on May 1, 2013.   The Commissioner subsequently had Plaintiff examined by a consultative internist, Michael Rosenberg, M.D. ("Rosenberg"), and a consultative psychologist, Adam Brownfeld, Ph.D. ("Brownfeld").   Rosenberg did not identify any functional limitations related to Plaintiff's psoriasis, though he indicated that Plaintiff "should avoid smoke, dust, or other known respiratory irritants in view of his history of asthma."[1]   During Brownfeld's examination, Plaintiff indicated that he had been taking care of his parents, both of whom were suffering with cancer, and that he felt depressed.   Plaintif also told Brownfeld that he had "excessive worry" over how people perceived him due to his psoriasis.[2]   Brownfeld's diagnosis was "generalized anxiety disorder" and "major depressive disorder, moderate," for which the prognosis was "good."[3] Brownfeld's medical source statement was as follows:

> No evidence of limitation in following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, and making appropriate decisions.   He is moderately to markedly limited in relating adequately with others and appropriately dealing with stress.

Transcript 240.

After the Social Security Administration denied the claim initially, a hearing was held before an Administrative Law Judge ("ALJ") on July 11, 2016, at which Plaintiff appeared and waived his right to be represented by an attorney.   The ALJ took

---

[1] Transcript 236.
[2] Transcript 239.
[3] Transcript 240-241.

testimony from Plaintiff and from a Vocational Expert ("VE").    When the ALJ asked Plaintiff if he had "worked at all" after applying for SSI benefits, Plaintiff answered that he had only worked part-time for "maybe" a "month and half on and off" as a cleaner.[4] When the ALJ asked Plaintiff how he spent his days, Plaintiff indicated that he went hiking, walked his dog, drew pictures, and tried to avoid being seen by people due to embarrassment about his psoriasis.[5] Plaintiff indicated that he was not pursuing any mental health treatment, because he had just decided to smile and be positive about his problems, and because he did not want to take mental health medications.[6]

During the hearing, the ALJ observed that that there was a gap in the record (Plaintiff's medical records from 2015 and 2016 were missing) and following the hearing she obtained the missing records (Exhibits 6F-9F). Such records contained several references to Plaintiff sustaining physical injuries while engaged in professional wrestling during the alleged period of disability.[7]   The ALJ provided Plaintiff with copies of the records and gave him an opportunity to submit comments, questions or additional records, or to request a supplemental hearing, but Plaintiff declined to do any of those things.[8]

Plaintiff's treatment records were primarily from two sources:   His primary care physician, Timothy Hessert, M.D. ("Hessert") and Helendale Dermatology & Medical Spa ("Helendale").   During the relevant period of alleged disability in this action

---

[4] Transcript 33, 42, 58
[5] Transcript 41
[6] Transcript 46-47
[7] Transcript 347, 350-351, 353, 370, 430
[8] Transcript 230

(September 18, 2014 – February 14, 2017), the medical records show that for most of that time (August 27, 2014-December 2015) Plaintiff was taking the injection Stelara, which provided excellent results and essentially eliminated his psoriasis.[9] However, in January 2016, the Stelara was discontinued because Plaintiff had tested positive for tuberculosis.[10] Subsequently, Plaintiff had some psoriasis flares, and he was started on a new medication, Otezla.[11] Subsequent office notes by Hessert, on March 24, 2016, April 6, 2016, May 26, 2016 and July 18, 2016, all indicate that Plaintiff's skin was clear with no rash.[12]

On September 8, 2016, at the ALJ's request Hessert completed a post-hearing report concerning Plaintiff's ability to do work-related activities.[13] Hessert indicated that *in general* Plaintiff had no limitation on his ability to lift or carry; to sit, stand or walk; to use his hands or feet; or to perform his activities of daily living. The report stated, though, that "during psoriasis outbreaks," Plaintiff's ability to walk would be limited to four hours per day, and his ability to use his hands would be limited, particularly his ability to "handle" and "push/pull" with his left hand. However, Hessert did not indicate that Plaintiff was presently experiencing psoriasis outbreaks.

---

[9] Transcript 251, 301, 310, 312. At the hearing Plaintiff told the ALJ that he was on Stelara for less than three months, Transcript 37, but that is clearly refuted by the medical record. Indeed, Plaintiff's counsel admits that Plaintiff was on Stelara for "about a year," though it was actually more than a year. Docket No. [#10-1] at p. 10.
[10] Transcript 312
[11] Transcript 314
[12] Transcript 347, 350-351, 353, 356.
[13] Transcript 405-410.

On February 14, 2017, the ALJ issued her decision, denying Plaintiff's application, and finding that he was not disabled at any time between the date of his application and the date of her decision. In pertinent part, the ALJ found that Plaintiff had not engaged in substantial gainful activity since applying for benefits; that he had serious impairments consisting of psoriasis, anxiety disorder and affective disorder; that such conditions did not meet of equal a listed impairment; that he had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but should avoid respiratory irritants and was limited to simple "low stress jobs defined as only occasional interaction with coworkers"; that he had no past relevant work; and that he could perform several other jobs that the VE had identified.   In explaining her RFC finding, the ALJ summarized the medical evidence in pertinent part as follows:

> Although the record shows dermatologic treatment flares, it lacks sufficient evidence to show the claimant could not perform basic work-related activities within his residual functional capacity.   The overall evidence of record shows waxing and waning of psoriatic flares.  . . .   In any event, the claimant carried on with his daily activities including professional wrestling.   [The claimant had some flares after he stopped taking Stelara, however his] wrestling activities of April 6, 2016 indicates the effects of the flares did not significantly interfere with his daily, hobby, or leisure activities.  . . .   the undersigned notes the claimant did not mention his wrestling activities in hearing testimony[.][14]

The ALJ gave "some weight" to Dr. Hessert's report, but observed that his treatment notes did "not support the frequency and intensity of flares or outbreaks to support significant limitations."[15]   The ALJ gave "great weight" to Brownfeld's report, and indicated that the portion of her RFC finding which limited Plaintiff to low stress jobs

---

[14] Transcript 20-21
[15] Transcript 21

involving only occasional interaction with coworkers was based on such report.[16]   The ALJ also gave "great weight" to Rosenberg's report.   The ALJ indicated that she did not find Plaintiff entirely credible for various reasons, including his failure to tell her about his professional wrestling activities.[17]

After receiving the ALJ's unfavorable ruling, Plaintiff retained an attorney who, on April 3, 2017, notified that Appeals Council that he was requesting an extension of time in which to submit an appeal.[18]   On April 14, 2017, the Appeals Council granted Plaintiff a 25-day extension to submit the appeal.   According to Plaintiff's counsel, on May 5, 2017, counsel's office submitted a new report from Dr. Hessert to the Appeals Council via fax, though the Commissioner has no record of having received such a fax and Plaintiff does not have a receipt showing that the fax was actually sent.   In any event, Hessert's new report, dated April 6, 2017, indicated that Plaintiff's diagnosis was psoriasis involving "extensive lesions" on the hands and feet imposing "marked" limitation of function despite treatment.   Hessert indicated that Plaintiff could work eight hours per day, during which he could stand for four hours at a time and for eight hours total, sit for four hours at a time and for eight hours total, occasionally lift 50 pounds, frequently lift 20 pounds, perform fine manipulation with his right hand frequently and with his left hand occasionally, perform gross manipulation with both hands occasionally, and never tolerate heat or cold.   Hessert further stated that Plaintiff suffered from "moderate" pain and "extreme" pruritis (itching).[19]   On September 7,

---

[16] Transcript 19, 22
[17] Transcript 21
[18] Transcript 131.   Counsel's letter did not make any legal argument or indicate the basis for the appeal.
[19] Docket No. [#10-3]

2017, the Appeals Council issued a notice indicating that it found no basis to review the ALJ's decision.

On November 1, 2017, Plaintiff commenced this action. On July 25, 2018, Plaintiff filed the subject application for judgment on the pleadings, arguing that the Commissioner's decision should be reversed for the following reasons: 1) the ALJ erred in finding that Plaintiff's psoriasis did not meet the requirements of Listing 8.05; 2) the ALJ failed to properly evaluate Dr. Hessert's September 2016 opinion; 3) the ALJ failed to incorporate all of the limitations in Dr. Brownfeld's report into the RFC determination, despite claiming to have given the report "great weight"; 4) the ALJ failed to develop the record concerning Plaintiff's professional wrestling activities; and 5) the new evidence (Hessert's report dated April 6, 2017) submitted to the Appeals Council warrants a remand.

Notably, in making these arguments, Plaintiff concedes that he was not disabled between the date he filed the SSI application and September 2015, because the Stelara medication was so effective. Plaintiff contends, though, that he should be found disabled during the period September 2015 through the date of the ALJ's decision, when he had stopped taking Stelara. The Court disagrees, in general for reasons set forth below, and because Plaintiff did not actually stop taking Stelara in September 2015 as he claims, but rather he received his last Stelara injection on September 4, 2015, which lasted for the next three months, meaning that he was actually "on" Stelara until December 2015.[20] Plaintiff also admits that he "did not volunteer" information about his

---

[20] Transcript 310. Because of that, at the very most Plaintiff could have had a period of disability between December 2015 and the date of the ALJ's decision, though as explained herein he did not

wrestling activities "at his hearing" and may have been "less than forthcoming," although he still faults the ALJ for failing to develop the record further after she learned of his untruthfulness.[21]

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."   The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."   *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

<u>The ALJ Did Not Err in Finding that Plaintiff's Psoriasis Did Not Meet or Functionally Equals Listing 8.05</u>

Plaintiff contends that the ALJ erred insofar as she "ignored Dr. [Elizabeth] Arthur's medical opinion that supported a finding of disability under Listing 8.05."[22] Listing 8.05 pertains to "Dermatitis (for example, psoriasis, dyshidrosis, atopic dermatitis, exfoliative dermatitis, allergic contact dermatitis) with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed."   The listing describes "extensive skin lesions" as follows:

---

establish that he was actually disabled during that period.
[21] *See*, Plaintiff's Memo of Law, Docket No. [#10-1] at p. 26 ("[E]ven if Plaintiff was less than forthcoming, he still deserved the fair and principled consideration as those with valid claims who proceed in complete good faith.")
[22] Pl. Memo of Law [#10-1] at p. 12.

8

1. Extensive skin lesions.

Extensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation. Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:

a. Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.

b. Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.

c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

Listing 8.00(C)(1).

Plaintiff admits that it is unclear whether Dr. Arthur is actually the author of the report but contends that it is "reasonable to assume" that she is the author.   Plaintiff further contends that the report describes his psoriasis in terms that meet or medically equal Listing 8.05.   In this regard, Plaintiff interprets the report as indicating that he "was going to need laser treatment on greater than ten percent of his body."[23]

The ALJ did not specifically refer to the report upon which Plaintiff relies, but stated more generally:

The evidence concerning claimant's psoriasis does not satisfy the criteria of Section 8.00, Skin Disorders.   The medical evidence falls short of the criteria of the section, and no medical source has mentioned findings equivalent in severity to the criteria of any listed impairment.[24]

---

[23]  Pl. Memo of Law [#10-1] at p. 12.
[24]  Transcript 18.

Defendant contends that the ALJ was correct in that regard.[25]  Defendant asserts that even assuming *arguendo* that the document cited by Plaintiff is a medical opinion, "it was offered regarding a time period that is prior to the date of Plaintiff's application and, thus, outside of the relevant time period in this case."[26]   Defendant further asserts that the report actually indicates that Plaintiff needed laser treatment for psoriasis on *less than* ten percent of his body, and that the psoriasis did not affect his mobility.

Initially, insofar as Plaintiff contends that the ALJ "ignored" the subject report allegedly authored by Dr. Arthur, the argument lacks merit.   The ALJ stated that she considered all of the medical evidence,[27] and she can hardly be faulted for failing to expressly state that she considered the subject report "written by Dr. Arthur" since, as Plaintiff admits, the signature on the report is illegible.[28]   Further, the Court agrees with Defendant that the ALJ's finding is supported by substantial evidence.   In this regard, Defendant is correct that Plaintiff has misinterpreted the notation in the report "<10%" to mean greater than ten percent, when it actually means less than ten percent. Moreover, there is substantial evidence of record that Plaintiff's psoriasis does not result in the type of serious limitations envisioned by the listing.[29]   Accordingly, insofar as Plaintiff's motion is based on Listing 8.05 or medical equivalence, it lacks merit and is denied.

---

[25] Def. Memo of Law [#14-1] at pp. 10-11.
[26] Def. Memo of Law [#14]1] at p. 11.
[27] Transcript 15.
[28] Transcript 267.
[29] *See, e.g.*, Transcript 235-236 (Consultative examiner Dr. Rosenberg observed "evidence of psoriasis involving both elbows, knees, hands, and shin regions bilaterally," but did not indicate that such condition resulted in any functional limitations).

<u>The ALJ Did Not Err When Evaluating Dr. Hessert's Opinion</u>

Plaintiff next contends that the ALJ erred when evaluating opinion evidence from his treating physician Dr. Hessert which, Plaintif maintains, "supports a finding of prospective disability as of September 2015."[30]   In this regard, Plaintiff is referring to the report that Dr. Hessert completed on September 8, 2016,[31] after Plaintiff had stopped taking Stelara.   As already mentioned, the report indicates that Plaintiff *in general* had no limitation on his ability to lift or carry; to sit, stand or walk; to use his hands or feet; or to perform his activities of daily living.   The report stated, though, that "during psoriasis outbreak," Plaintiff's ability to walk would be limited to four hours per day (though his ability to sit and stand would not be affected), and his ability to use his hands is limited, particularly his ability to "handle" and "push/pull" with his left hand.

At the outset the Court observes that the report to which Plaintiff refers is part of Exhibit 9F, which is one of the exhibits that the ALJ obtained after the hearing.   That is, because Plaintiff was proceeding *pro se*, and because there was a gap in the record, the ALJ developed the record by obtaining Exhibit 9F (along with Exhibits 6F-8F) following the hearing.[32]   The ALJ gave "some weight" to the opinion or Dr. Hessert, a pediatrician, but noted that "the dermatologic treatment notes [did] not support the frequency and intensity of [psoriasis] flares or outbreaks to support significant limitations."[33]   The ALJ further noted that when Plaintiff testified about his psoriasis flares, he mainly mentioned "the cosmetic effects," "rather than limitations or inability to

---

[30] Pl. Memo of Law [#10-1] at p. 14.
[31] Transcript 405-410.
[32] See, Transcript 14-15, 32.
[33] Transcript 21.

perform basic work-related activities."[34]

Plaintiff maintains that in giving only "some weight" to Hessert's opinion, the ALJ failed to "properly evaluate" the fact that Plaintiff could no longer take Stelara, which had provided him with excellent relief, and may have either improperly "penalized" him for discontinuing Stelara, or "misunderstood" the reasons why he stopped taking Stelara.[35] Further, Plaintiff asserts that Dr. Hessert "apparently" opined that "Plaintiff could perform only 'desk work' or 'administrative activities,'" while admitting that Hessert's report "is somewhat internally inconsistent" on that point.[36]

These arguments lack merit. To begin with, the ALJ clearly understood the reason why Plaintiff stopped taking Selara. *See*, ALJ's Decision, Transcript 19 ("He stopped taking Stelara injection because he acquired tuberculosis."). Further, Hessert did not opine that Plaintiff was limited to desk work. On this point, the form which Hessert completed asked, "*If* the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is the individual performing for the rest of the 8 hours?"[37] Hessert had indicated that Plaintiff was capable of sitting, standing and walking in excess of 8 hours total even with a psoriasis flare-up, and consequently any response that he provided was unnecessary and irrelevant. Even so, Hessert indicated that to the extent that Plaintiff could only walk for four hours during a workday in which he was experiencing a psoriasis flare, he could still sit and/or stand for eight hours each, and could also perform desk work if necessary.

---

[34] Transcript 21-22.
[35] Pl. Memo of Law [#10-1] at pp. 15-16.
[36] Pl. Memo of Law [#10-1] at pp. 16-17.
[37] Transcript 406 (emphasis added).

Moreover, the ALJ correctly observed that Hessert's office notes during the period after Plaintiff stopped taking Stelara do not support a finding of disability. Instead, as mentioned earlier, Hessert's office notes from March 24, 2016, April 6, 2016, May 26, 2016 and July 18, 2016 all expressly state that Plaintiff's skin was clear with no rashes.   Indeed, Hessert's report can best be understood as indicating what Plaintiff's limitations might be if he had a bad psoriasis flare-up, but not as indicating that Plaintiff actually had such limitations at the time the report was written.   Accordingly, the ALJ's decision to give only some weight to Hessert's opinion is supported by substantial evidence. Consequently, this aspect of Plaintiff's motion is denied.

<u>The ALJ Did Not Err With Regard to Her Treatment of Dr. Brownfeld's Opinion</u>

Plaintiff next maintains that the ALJ's RFC determination is inconsistent with her statement that she was giving "great weight" to the opinion of consultative examiner Dr. Brownfeld.   In that regard, Plaintiff maintains that the ALJ's RFC determination does not incorporate Brownfeld's opinion that Plaintiff is "moderately to markedly limited in relating adequately to others and appropriately dealing with stress."   According to Plaintiff, the ALJ

> failed to explain how [Brownfeld's opinion concerning Plaintiff's ability to interact with others and deal with stress] was reconciled in Plaintiff's RFC, which includes only a limitation in interacting with co-workers, but is silent on Plaintiff's ability to interact with the public or supervisors and specific issue [sic] dealing with stress.

Pl. Memo of Law [#10-1] at p. 21.

As a preliminary matter, Plaintiff's argument on this point is hollow given that his alleged difficulty in being around people is directly belied by his decision to pursue a career in professional wrestling, which will be discussed further below. In sum, Plaintiff is an entertainer who performs in front of crowds and interacts regularly with the public. Plaintiff failed to disclose this fact to Brownfeld, but instead told Brownfeld that he does not like to go out in public. Accordingly, Plaintiff's attempt to now rely on Brownfeld's report as a basis for remand is disingenuous.

Beyond that, the premise of Plaintiff's argument (that when an ALJ gives "great weight" to a medical opinion she must necessarily incorporate every limitation expressed in the opinion into the RFC finding) is incorrect. *See, e.g., Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). In any event, here the ALJ expressly incorporated Brownfeld's opinion that Plaintiff is "markedly to moderately limited in relating adequately with others and appropriately dealing with stress" into the RFC determination when she limited Plaintiff to low stress jobs that involved only occasional interaction with coworkers. Plaintiff complains that the ALJ should have also indicated that he was required to have limited contact with supervisors and with the public, but he has not shown that the jobs which the ALJ identified as being suitable for him require such contact.[38] Moreover, when the ALJ posed the relevant hypothetical question to

---

[38] Transcript 23 (The ALJ indicated that Plaintiff could perform the jobs of "marker," DOT 209.587-034, "bagger" DOT 920.687-018, and "shelver," DOT 249.687-014.

the VE, she told the VE to consider a claimant who "should be limited to low stress jobs defined as only occasional interaction _with others_, with coworkers."[39]  In response, the VE identified the jobs which the ALJ cited in her decision finding that Plaintiff could perform other work.   It is highly unlikely that the VE would have understood the question as looking for jobs that would involve limited interaction with co-workers but not also with supervisors or the public.   Consequently, this aspect of Plaintiff's motion is also denied.

> The ALJ Was Not Required to Develop the Record
> Concerning Plaintiff's Wrestling Activities

Plaintiff next contends that the ALJ erred by failing to develop the record after she received the additional medical records referencing his professional wrestling activities.   This argument deserves little discussion.   At the hearing, the ALJ asked Plaintiff to describe his activities, and he essentially indicated that he does not work at all and lives a quiet life at home out of the public eye, due to his uneasiness with people seeing his psoriasis.[40]   Upon obtaining Plaintiff's additional medical records, the ALJ learned about Plaintiff's wrestling activities, though not the full extent thereof as will be seen below.   The ALJ provided copies of the records to Plaintiff and gave him an opportunity to comment on them or to request a supplemental hearing, which he declined.[41]   Plaintiff hid the fact of his wrestling from the ALJ and then declined the opportunity to provide an explanation.   Plaintiff cannot now be heard to complain about

---

[39]  Transcript 44 (emphasis added)
[40]  Transcript at 41.
[41]  Transcript 15

the ALJ's failure to hold a supplemental hearing to explore the particulars of his wrestling career. *See, Van Orden v. Astrue*, No. CIV.A.109CV81GLSVEB, 2010 WL 841103, at *5 (N.D.N.Y. Mar. 11, 2010) ("Plaintiff cannot legitimately argue that the ALJ committed reversible error by failing to, *sua sponte*, attempt to untangle what appears to be deceitful testimony and elicit rehabilitative information at a supplemental hearing.").

Although the actual extent of Plaintiff's wrestling activity is not explained in the record, the record nevertheless contains sufficient information to justify the ALJ's decision insofar as it refers to such activity. Accordingly, Plaintiff's argument on this point is denied based on the administrative record before the Court.

While the Court need not rely on any additional bases to deny Plaintiff's motion, it observes that in arguing for remand on this point, Plaintiff could have proffered what he would hope to establish at a supplemental hearing.[42] In other words, if the ALJ was mistaken in her assessment of the record, Plaintiff could have offered to clear up the matter. For example, Plaintiff could have indicated that at a supplemental hearing he would show that the references to professional wrestling activities in his medical records were errors, or that his wrestling activities were actually limited in scope, such that the ALJ should not have relied upon them in denying his claim. However, Plaintiff did nothing of the sort. Instead, he merely implies that if the ALJ had developed the record further, she would not have denied his claim.[43]

---

[42] Putting aside the fact that Plaintiff waived the opportunity for a supplemental hearing, as already mentioned.

[43] *See*, Plaintiff's Memo of Law [#10-1] at p. 24 ("[T]he ALJ did not know the *actual circumstances* of Plaintiff's wrestling to really know if it undermined his physical impairment of psoriasis. The appropriate course of action would have been to simply ask Plaintiff about his activity prior to using it as a cornerstone of the denial.") (emphasis in original).

16

Such suggestion is troubling to the Court in view of the fact that Plaintiff's wrestling activities actually appear to have been quite extensive throughout the period of alleged disability, to the point that he has reportedly referred to wrestling as his "career" and his "day job." While not part of the administrative record, Plaintiff has apparently achieved sufficient notoriety in the world of professional wrestling to the point that a simple internet search reveals at least two articles written about his wrestling career. Interestingly, both articles were published by the National Psoriasis Foundation and discuss Plaintiff's commitment to a career in professional wrestling notwithstanding his psoriasis diagnosis.

The first article, dated February 6, 2017 (within the period of alleged disability), and entitled "No Holds Barred For This Psoriatic Psuperhero," states:

> Professional wrestler Michael Murray puts new meaning into the phrase "wrestling with psoriasis.
>
> When Michael Murray was just three, he developed severe asthma. When he was 13, he was diagnosed with psoriasis. "The weird thing is, the asthma and the psoriasis swapped out," he said. "I haven't had an asthma attack and gone to the hospital since I was 12."
>
> Growing up with trouble breathing, followed by plaque psoriasis that "breaks out in chunks or big splotches," doesn't seem like a promising start for a professional wrestler. But Murray, who is 29, has been wrestling since he was 15. <u>"Yes, this is my day job," he said.</u>
>
> Murray wrestles under the name Dewey Murray, "The Big Mutha Trucka" (his weight: "A Full 18 Wheels"), <u>and has performed all over the U.S., in Canada and Japan. He appears on the indie wrestling circuits. Indie circuits are similar to baseball's minor leagues. Indie wrestlers compete to advance to the televised big leagues, such as World Wrestling Entertainment and Total Nonstop Action</u>

Wrestling.

"As you go along you build a reputation and you hope you get your big break," he explained. "It's basically what you see on TV, but at a lower level. The competition is fierce. Everyone wants to move up."

**Wrestling brings respect**

"When my psoriasis first appeared, we didn't know what it was," Murray recalled. "No one in my family had ever had it. I had a good doctor, and he did research into it."

He had some bad reactions to Stelara (ustekinumab) and Otezla (apremilast) and now uses the topical Clobex (Clobetasol propionate). "Sometimes I get clear," he said, "but it's never for more than two or two-and-a-half months."

Before a match and before he works out, he oils his skin. He usually uses something with a cocoa butter base. He also trains with long sleeves on.

"I have flare-ups," he said. "But I can use my trucker gimmick to control what a crowd sees. I can wear jeans. If my elbows are pretty bad, I can wrap bandanas around them. Plus, then I can sell souvenir bandanas at the merch table."

Because of the appearance of his skin, some wrestlers "will steer clear away from you," he said. "You have to explain yourself. It's awkward."

But most of the wrestlers he encounters are professionals who came to wrestle, not discriminate. "This profession is all about respect," he said.

Murray's family (his mother is deceased) has been supportive of his career choice. "My father and sister saw me in a meet at the Prudential Center in Newark, New Jersey. My sister saw he was crying and asked him why, and he said he wished my mother could see me. My father wouldn't have me give up what I'm doing for anything."

**Making psoriasis cool**

Murray trained at the Kayfabe Dojo Wrestling school in his hometown of Rochester, New York, when he was a teenager. Now he's a teacher. He's not

just teaching holds either.

"I teach a lot about trust and responsibility," he said. "When I meet you, I have to trust you. I have to trust that you're not going to drop me on my head, that you're not going to paralyze me. I also teach them about responsibility. If I have to drive four hours for a match, you will be there. You'll be on time. There are a lot of life lessons here."

Life lessons can come in unexpected ways. "I was doing a show, and there were these two boys there with their mom," Murray recalled. "One was 13 or 14, and the other was 8 or 9. They were in line for photos. I heard the younger boy say to his brother, 'He has what I have!' When they got to me, he said, 'You have psoriasis. That's really cool!'

"You have a kid with psoriasis that's that age, a kid that's terrified to be in a classroom with 20 or 30 other children," he continued. "They see me going out in front of 500 people in jeans and a singlet, showing a lot [of skin], and I don't care. That means something to that kid."

As for his psoriasis, he said, "Everyone's given a lemon at some point in life. You just make the best of it."[44]

The second article written about Plaintiff, dated September 21, 2018, and entitled

"Putting the Powerslam on Psoriasis," states:

Professional wrestler Michael Murray takes his profession and psoriatic disease seriously.

Michael Murray is only 30, but he's been through a lot. When he was 3, he developed severe asthma, which sometimes meant unscheduled trips to the hospital. The asthma went away at age 13, which was great, but then he was diagnosed with psoriasis, which was not so great. And ever since he was 15, he's been thrown all over the place – in the wrestling ring.

---

[44]

http://webcache.googleusercontent.com/search?q=cache:K4sBzCGgd5lJ:https://www.psoriasis.org/blog/no-holds-barred&client=firefox-b-1-d&hl=en&gl=us&strip=1&vwsrc=0

Murray is a professional wrestler who goes by the name of Dewey Murray, "The Big Mutha Trucka" (his weight: "a full 18 wheels"). A native of Rochester, New York, he's wrestled all over North America and in Japan. And up until 2017, he was wrestling even though he had plaque psoriasis that, as Murray puts it, "broke out in chunks or big splotches."

For years before a match or before he worked out, he oiled his skin, usually using something with a cocoa butter base. He also trained with long sleeves on.

Some wrestlers took one look at his skin and didn't want to go near him, but most, he says, were professionals who came to wrestle, not discriminate. "Everyone's given a lemon at some point in life," Murray says. "You just make the best of it."

Murray has worked hard to make the best of it. He appears regularly on the indie wrestling circuits, which are similar to baseball's minor leagues. Indie wrestlers compete to advance to the televised big leagues, such as World Wrestling Entertainment and Total Nonstop Action Wrestling (now Impact Wrestling). He teaches wrestling, and not just holds. "I teach a lot about trust and responsibility," he says. "This profession is all about respect. There are a lot of life lessons here."

**The winning formula**

Murray has also never given up on appropriately treating his psoriasis. The first two biologics he tried weren't effective; they caused some adverse reactions and provided temporary relief at best. When he had flare-ups, he had to use his trucker gimmick to control what the crowd saw. "I could wear jeans," he says. "If my elbows were bad, I could wrap bandanas around them. Plus, then I could sell souvenir bandanas at the merch table."

In 2017, Murray's doctor prescribed his third biologic, and this time everything fell into place.

"I haven't had a flare, nothing, in a year and a half," he says. "I actually took a vacation and I went swimming. I haven't done that in awhile. I could put on swim trunks and not worry about what my legs, knees, arms, chest, sides and back looked like. I could just go swimming. I can wear dark colors. I can be normal, not cautious."

Being clear has affected him at work, too. He has more energy – and no blood on his elbows. "Now my bandanas are just a look," he says. "I'm not hiding anything anymore."

He's had no adverse reactions to his current biologic, except for what he calls his "sleepy day" – 48 hours after taking the shot, he's "a zombie." He always tries to schedule his shot for Mondays, because on Wednesdays he's usually between events.

"I'm happy," Murray says. "And I'm expanding." In addition to wrestling, in the summer of 2018, Murray hosted the Backwoods Riot Music Festival in Andover, New York – six country and rap acts performing for 2,500 people. He also hosted an NPF fundraising dinner in New York City and is looking for other ways to get involved with NPF, spread awareness and educate others about psoriasis.

Murray has been through a lot, but he's built for the long haul. In the Big Mutha Trucka, psoriasis has met its match.[45]

If the information in these articles is true, then Plaintiff's argument concerning development of the record, not to mention his entire claim of disability, is bogus, which could raise a host of potential problems for him including potential criminal liability.[46] Again, the Court need not and does not rely on this information to deny Plaintiff's claim, but includes it here for purposes of completeness and to caution Plaintiff and Plaintiff's counsel about their Rule 11 obligations.

---

[45] https://www.psoriasis.org/advance/putting-powerslam-on-psoriasis

[46] It is a crime to obtain or to attempt to obtain SSI benefits by fraud. *See*, 42 U.S.C. § 1383a(a)(3) ("Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such [SSI] benefit, or (B) the initial or continued right to any such benefit of any other individual in whose behalf he has applied for or is receiving such benefit, conceals or fails to disclose such event with an intent fraudulently to secure such benefit either in a greater amount or quantity than is due or when no such benefit is authorized . . . shall be fined under Title 18, imprisoned not more than 5 years, or both[.]") Income tax evasion is another crime, and the record shows that through 2016 Plaintiff reported no income from any professional wrestling activities or from working as a teacher at the Kayfabe Dojo.

<u>Remand is Not Required to Consider New Evidence</u>
<u>Submitted to the Appeals Council</u>

Lastly, Plaintiff maintains that he submitted new medical evidence to the Appeals Council which was not considered.   As mentioned above, Plaintiff maintains that additional medical evidence was submitted to the Appeals Council on May 5, 2017, consisting of a new report from Dr. Hessert, and that remand is required because the Appeals Council apparently did not consider the report.

Defendant responds that it is unclear whether Plaintiff's attorney actually faxed Dr. Hessert's report to the Appeals Council,[47] and that the report would not have caused the Appeals Council to reach a different conclusion in any event.[48]

The Court is of course inclined to accept representations of counsel made as an officer of the Court.   The problem here, however, is that Plaintiff's counsel has no personal knowledge as to whether Hessert's report was actually sent to the Appeals Council.   At most, Plaintiff's counsel indicates that her law firm's records imply that an employee faxed the report, though there is no affidavit from that employee and no actual fax receipt.[49]   Such facts, coupled with the fact that the Appeals Council did not

---

[47] As Defendant correctly points out, Plaintiff maintains that the report was faxed to the Appeals Council on May 5, 2017, but the documentation submitted by Plaintiff is not an actual fax receipt, therefore it is unclear when the document was faxed, or to what fax number it was sent.
[48] *See*, Defendant's Memo of Law [#14-1] at pp. 1 ("New evidence comprising of another medical source statement from Dr. Hessert does not undermine the [ALJ's] finding[.]"), 6, 13.
[49] In an attempt to seek clarification, the Court's law clerk telephoned Plaintiff's counsel to ask whether any fax receipt existed, and was told that there is no such receipt, and that the employee who would have faxed the report is no longer employed at the firm.

acknowledge receipt of the report, make is seem unlikely that it was sent.   In sum, this information is too speculative to warrant a remand.[50]

Even assuming *arguendo* that the Appeals Council received Hessert's report, which has not been shown, the Court agrees with Defendant that Hessert's new report would not have required the Appeals Council to review the ALJ's decision.   The relevant regulation, 20 C.F.R. § 416.1470(a)(5), states in pertinent part that "[t]he Appeals Council will review a case if . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."   Therefore,

> [i]n order to prevail on a motion for a remand based on new evidence, the plaintiff must demonstrate that the evidence is "new," "material" and that it "relate[s] to the period on or before the ALJ's decision." "New" evidence is simply that evidence which has not been considered previously during the administrative process.   Moreover, to be considered "new" evidence, the medical reports may not be cumulative to those already contained in the record.
>
> [***]
>
> Medical evidence is material if it is both relevant to the claimant's condition during the time period for which benefits were denied and probative.   The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide the claimant's application differently.

---

[50]  The Court also finds it odd that although Plaintiff's counsel had requested the extension of time in which to submit an appeal, and although the Appeals Council granted the request, nothing besides Hessert's report was purportedly ever sent expressing the grounds for the appeal. Rather, the only document in the Appeals Council's possession from Plaintiff's counsel is the letter requesting an extension of time to file an appeal.

*Milano v. Apfel*, 98 F. Supp. 2d 209, 215 (D. Conn. 2000) (citations and internal quotation marks omitted).

Here, Hessert's report dated April 6, 2017, is neither new nor material. The report is new in that it was not previously considered, but it is predominantly cumulative of evidence already considered by the ALJ, namely, Hessert's earlier report dated September 8, 2016. Both reports were written after Plaintiff had stopped taking Stelara, and neither report is supported by office notes showing that Plaintiff was actually experiencing psoriasis flares at the time they were written.[51] Indeed, between the time that the two reports were written, there are no additional office notes from Hessert's office, and therefore no apparent basis for Hessert to give an opinion in April 2017 that would be different from the opinion he gave in September 2016.[52] Consequently, insofar as Plaintiff's motion is based on the claim that the Appeals Council failed to consider Hessert's new report, it is denied.

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings [#10] is denied, Defendant's cross-motion [#14] is granted, and this action is dismissed. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

---

[51] To the extent that Plaintiff is maintaining that the later report indicates that he was presently experiencing lesions on his hands and feet, there is no support for such a statement by Hessert since the record indicates that he last examined Plaintiff in July 2016, at which time Plaintiff's skin was clear.
[52] Hessert's last office note is dated July 18, 2016, well before he wrote the earlier report in September 2016. *See*, Transcript 414

So Ordered.

Dated: Rochester, New York
      June 10, 2019

                                    ENTER:


                                    <u>/s/ Charles J. Siragusa</u>
                                    CHARLES J. SIRAGUSA
                                    United States District Judge